(86 Misc. Rep. 229)

RODEE et al. v. CITY OF OGDENSBURG et al.

(Supreme Court, Special Term, St. Lawrence County.   May, 1914.)

1. JUDGMENT (§ 951*)—CONSTRUCTION—EVIDENCE TO AID.
    If the meaning of a judgment is clear on its face, it cannot be changed by anything contained in the judgment roll, nor by evidence outside; but, where the meaning of the judgment is doubtful, the court may look at the decision and the pleadings to interpret it, as well as the history of the action.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1808–1812; Dec. Dig. § 951.*]

2. JUDGMENT (§ 524*)—CONSTRUCTION—AMBIGUOUS JUDGMENT.
    Where the meaning of a judgment is uncertain, and cannot be clearly gathered from the record, a construction adopted or acquiesced in by the parties, especially for a long time, will not be changed without strong reason.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 967, 982; Dec. Dig. § 524.*]

3. JUDGMENT (§ 524*)—CONSTRUCTION.
    In 1872 an action was brought to quiet conflicting claims to water rights, and a municipality which owned a water right in its private capacity was made a party.   The pleadings which made the conveyances, under which the parties claimed, a part of the complaint, referred to certain ways which some of the parties owned over the premises of the others, and the judgment reserved to the owners of water privileges the right to use as a common way the streets and ways designated on a map of the property.   It also imposed common obligations upon the owners of water power privileges to keep power canals and raceways, etc., bridged when crossed by streets or ways reserved.   The defendant municipality at that time had for over 20 years recognized its duty to maintain public bridges over the canals in question, and this public duty had been recognized by citizens who petitioned for needed bridges and ways. *Held*, that, in view of the continued acquiescence of the municipality in that duty until 1913, the judgment cannot be construed as imposing upon the owners of the water power rights the duty to maintain public bridges over the canals, conduits, and raceways, or to build new ones required upon the opening of public streets; the provisions with reference to bridges obviously referring to private ways.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 967, 982; Dec. Dig. § 524.*]

4. MUNICIPAL CORPORATIONS (§ 1038*)—ENFORCEMENT OF JUDGMENT.
    Where a municipal corporation in its private capacity owned a water right, and in such capacity was made a party to an action to adjudicate the conflicting claims of the owners, it cannot as such a party move under the judgment to require the other owners to establish bridges for public streets over the races and conduits incident to the use of the water power, for it is a party to the judgment only in its individual capacity, and the motion involves an exercise of its governmental capacity.

    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 2211; Dec. Dig. § 1038.*]

Action by Henry Rodee and others against the City of Ogdensburg and others.   On motion by defendant city to compel referees heretofore appointed under the judgment to repair or rebuild and to keep in repair certain bridges.   Motion denied.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

D. B. Lucey, of Ogdensburg, for property owners.

D. W. Mulligan, of Ogdensburg, for City of Ogdensburg.

BORST, J. Motion by the defendant city of Ogdensburg to compel the referees heretofore appointed under the judgment in this action to repair or rebuild, and to keep in repair, sufficient for the public use, the bridges over the canals, conduits, and raceways on Lake, Main, and River streets in that city on the property which was involved in the action known as the water power property.

In the decision of the matter is involved the interpretation of a judgment of this court rendered in the action in the year 1872, to which all the parties in interest here were parties. It is upon this interpretation that the parties radically differ: The city of Ogdensburg, a defendant in the action, contending that the parties owners of the property are bound by the judgment to build and maintain the bridges on the streets in question, not only for the convenience of the property but also for the public and the public use, and that it has such interest under the judgment as entitles it to call upon the court to make a decree to that effect in the action. The referees and owners interested challenge the power of the court to grant by motion the relief demanded, and also contend that the judgment in the action does not permit the interpretation contended for on behalf of the city; while, conceding that they are to build and maintain bridges sufficient for the property's use, they contend that this is the extent of their liability. It is not claimed but that the present bridges are sufficient in size and strength for the use of the property, but only that they are insufficient for the public use.

This naturally brings us to an examination of the judgment and a consideration of its provisions. It may be remarked at the outset that it appears from the judgment roll that the parties to the action were represented in the litigation by the most eminent counsel in Northern New York at that date. The judgment was evidently prepared by them with great care and detail to meet the situation that embarrassed the management and use of the property at that time. In this opinion every reference to streets and bridges in the judgment roll in the action will be noted that it may be seen that the determination reached is made at least with full knowledge of the provisions of the judgment.

The judgment recites that it is based on the pleadings, proofs, and decisions in the action; it describes the entire property by a general description of its outside boundaries and apparently covers everything within those boundaries, including the streets in question. It designates the property as the Ogdensburg Water Power property; that the water thereon is divided into 168 runs of which 25 are first class, 75 are second class and 68 surplus, the amount of water allotted to a run being fixed and stated; it names the owners of the different parcels of the property with the runs of water to which each parcel is entitled, and recites that the defendant city is the owner of that portion of the property which lies on the east side of the Oswegatchie river with one run of water of the first class and four of the second class and the surplus water thereto belonging.

In the description of the property reference is made to a street laid out at right angles to the Morristown Road as follows:

"Along the center of a new street (now Canal street) of sixty feet width, to be laid out and opened twelve chains and four links; thence easterly at right angles to the last line and along the center of a new street (now King street) to be laid out and opened of sixty feet width."

.It is stated in the description of the property in the judgment that the map known as the Gilbert Map, made in 1842, "on which are designated the several sections and lots into which said property is subdivided, and the waters and water courses connected therewith, is in all respects a correct map of the same, and the lots, sections, lands and water courses" mentioned in the judgment are the same as those designated on the map, and to which reference is made as a part of the judgment. The judgment describes the ownership of the several lots in the property with their water privileges and adjudges:

"That those portions of said water power property which remain undivided comprising the land reserved for widening the canal, the ground on which the walls of the canals and basin stand, the streets laid out on said property, the bed of the basin, canals, race-ways and sluices, and the bed of the Oswegatchie river opposite said property, except the parts thereof opposite the lots, * * * are now owned by the parties to this action, subject to the covenants * * * mentioned."

By the judgment certain rights are adjudged to belong to the owners of water privileges in common, among others: ·

"The right to use as a common way the streets and ways designated on the map of said property subject to the rights granted to parties interested to convey water in, along and across the same, and to such other uses as shall be necessary to the enjoyment of the rights and privileges granted or reserved, as hereinafter set forth."

Further common rights are extended to each property owner, such as the right to enter upon each parcel of property to ascertain if the obligations to which the same are subjected are complied with; the right to make or cause to be made repairs to bulkheads, flumes, raceways, and dams; also, "the right of exemption from any damages for any failure of dams, canals * * * or bridges which any party may be bound to maintain or contribute to maintain, provided such party shall have used due diligence to maintain the same." Further common obligations are imposed upon the owners of the water power privileges and property, "the obligation to excavate * * * water races * * * to keep the same * * * bridged wherever the same are crossed by streets or ways reserved." Certain of the properties are charged in the judgment with certain special obligations, among them named:

"Lot No. 21, section D, the right * * * of using thereon two runs of water * * * the same to be taken in covered trunks, laid as low and deep as can be reasonably done, across River street, and to be so covered and embanked as to create no obstruction in said street," and "upon the lots with which water power is granted in said partition deed (hereafter referred to) and the owners * * * for the time being, to perform and observe all the covenants on the part of the grantors contained in the original deeds of lots Nos. 1, 2, 3, and 4 of section A, and lot No. 6 in the Vilas Plot * * * in the proportions that the number of runs of water granted to said lots

by said partition deed respectively bears to the whole number of runs thereby granted * * * to pay and contribute * * * toward the expenses of repairing and maintaining the dam across the river, * * * the bulkheads at the head of the canals respectively, the embankment between the pond and the canal and along the canal across Lake street, and along the southerly line of the Vilas Plot; also the canal and embankment on both sides of Main street, the canal across River street and the easterly wall of the canal between Main and River streets, and the bridges over said canal and over the waste races crossing Main street, and over other races, if any, crossing streets (except River street easterly of the lower pond), when not chargeable upon particular premises as herein provided. And also any other parts of said water power property not herein otherwise provided for."

Other obligations and restrictions are imposed on certain property owners, and the judgment then provides:

"Upon the owners or occupants of lot No. 20, section D, and of the lots along the easterly wall of the basin, except lot No. 10, the obligation to maintain the bridges along or opposite their respective premises except when the public shall assume and maintain them."

Further restrictions, rights, and privileges are enumerated and provided for with reference to maintaining the property, its canals, bulkheads, races, and parts, with provisions for enforcing the judgment and collecting the assessments to be made to repair, maintain, and support the property. A referee (subsequently increased to three by the court) was appointed to carry the provisions of the judgment into effect under the direction of the court. The referee was given general power by the judgment to cause the rights, obligations, and restrictions, named in the judgment, to be performed, he was specifically directed to cause leakages to be stopped, to remove obstructions, excavate raceways, establish bolts and gauges, build bulkheads and measuring weirs, and to do many other things but with no direction to build bridges except as it might be found in the general power of the referee to enforce the provisions of the judgment.

[1, 2] The meagerness of the provisions in the judgment with reference to streets and bridges leaves the situation in doubt as to what was intended, and whether the references to streets and bridges in the judgment went any further than simply to provide for bridges in connection with the property and its use and the use of the waters, or required the parties to also maintain bridges for the public and the public use. To fully understand the judgment and its scope so as to correctly interpret it, we must go back to the complaint in the action and the decision. It is undoubtedly true that, if the meaning of the judgment is clear and plain on its face, it cannot be changed, extended, or restricted by anything contained in the judgment roll, aside from the judgment, nor by evidence outside of it. Where, however, the meaning of the judgment is doubtful, we may look at the decision and the pleadings to interpret it. It is also true that, in case the meaning of a judgment is uncertain and cannot be clearly gathered from the record, a construction adopted or acquiesced in by the parties, especially for a long period of time, will not be changed without strong reason. Freeman v. Freeman, 43 N. Y. 34, 3 Am. Rep. 657; 23 Cyc. 1101.

The referees and property owners opposing the contention of the city urge that the judgment is of doubtful meaning and construction, and that it may well be interpreted differently from the contention of the city, namely, that by reference to streets and bridges it was never intended to impose an obligation on the parties owning the property to construct bridges over the streets that were then on the property or that might thereafter be laid out on it by the public for the public benefit. The meaning of the judgment in this case, so far as it involves the disposition of this motion, is not so clear but that we may look not only into the decision on which it was based and the pleadings in the action, but also to the history of the property involved and the practical construction given to it by the parties to the action; nothing, however, to be considered which is contradictory to the provisions of the judgment.

[5] We therefore turn for further light to the history of the property in question, so far as it appears from the pleadings, the decision, and the judgment. This history commences with the year 1828, the time of the making of the first deed in the chain of its title, and describes the property as being principally on the westerly side of the Oswegatchie river in what was formerly the "village," but is now the "city," of Ogdensburg, and in the angle formed between the Oswegatchie river flowing northerly and the St. Lawrence into which it empties at that point. Numerous conveyances of parts of the property rapidly followed this first transfer, and the consideration named in them is an indication that even in those early days this property was regarded as valuable and much sought after because of the water power afforded it from the Oswegatchie river. From these deeds made between the years 1828 and 1842—and they were the important ones involved in the action—we learn that prior to the latter date much had been done towards developing and utilizing the waters of the Oswegatchie river on this property. The property had been surveyed as early as 1835 and a map made in 1838 which is referred to in certain of the deeds and stated to be correct in the judgment and from which it appears that the property on the westerly side of the river was divided into four sections called A, B, C, and D, with a fifth parcel on the easterly side now known as the waterworks property and owned by the city. The sections are subdivided into lots and are separated from each other on the map by what are named as streets, named as they are at the present time, although it was long after the making of the map, as we shall later see, that these streets were laid out as such.

At the date of the first deed, 1828, a dam existed across the Oswegatchie river. The deeds following this first one make it clear that the water from this dam was then utilized on the property in question. As early as 1835, a canal had been constructed which took the water from this dam over a part of this property across what were then used as roadways but what are now the streets in question. In addition to this canal, there was then a basin or pond, raceways, sluices, flumes, aqueducts, bulkheads, gates, and bridges on the property.

In the twelve deeds referred to and made a part of the complaint in the action and which are carried into the findings and decree, convey-

ances are made of rights and privileges in the water from the river to be taken in canals, sluiceways, and raceways, with covenants with reference to the amount of water that should be used, and each deed contained mutual covenants on the part of grantor and grantee with reference to rights in the water and the real estate.

This action was commenced in 1870. The complaint alleges that plaintiff and defendants each separately own certain portions of the water power property therein specifically described with certain rights in the water; that differences exist as to the amount of water each is to have by virtue of the conveyances and the way it is to be utilized, also as to the obligations of the parties in maintaining dams, canals, races, and bridges and other parts of the water power property; and that because of such differences and uncertainty certain of the parties are deprived of the use of water, which of right belongs to them. The relief demanded is that the court define the rights of the several parties in the property and water and the extent of the obligations of each to maintain the dams, canals, bridges, and other parts "of the said water power property" and to provide for the enforcement of these obligations of the different parties.

The first conveyance was made, as before noted, in 1828, and was by deed dated March 1st in that year from Nathan Ford to Thomas Denny, and conveyed 1,455.02 acres of land for the consideration of $45,000. The description in this deed was like that in the judgment, general, describing the property by outside boundaries and conveying the streets, if any, within such boundaries. The grantee in the same year sold two small parcels of the property, the one to Jacob Arnold and the other to Erastus Vilas. In 1835, Denny conveyed the remainder of the property which he had purchased to Smith Stillwell, Baron S. Doty, Harvey Thomas, John B. Bacon, Egbert N. Fairchild, and James G. Hopkins (afterwards known as the syndicate), and later in the same year the same parties purchased from the executors of the original grantee, Nathan Ford, another parcel of the property, and thereby they became the owners of all of what is known as the water power property except the small parcels that had been sold by Denny to Arnold & Vilas. Later this syndicate made conveyances which are named in the complaint as Exhibits 6, 7, 8, 9, 10, and 11, and a partition deed Exhibit 12. In each of these conveyances there were certain parcels of property and water rights granted; the grantors and grantees covenanting with reference to the amount of water that was to be had and taken with the properties so granted and also covenanting to maintain or assist in maintaining canals, dams, sluiceways, raceways, bulkheads, flumes, and bridges.

In the original deed to Denny streets are not mentioned as such. Two highways are mentioned; the one leading from the southerly end of the bridge which crossed the Oswegatchie river to Black Lake, known as Lake street, and the other leading from the same point of commencement over the Morristown Road (now Main street) on the property. In some of these conveyances after the first four, the streets or highways which appear on the map are referred to as owned by the

parties owning the water power property, and in others the title to the streets are conveyed or attempted to be conveyed.

The first reference we have to streets is in the deed Exhibit 5 of 1835 (before quoted in the judgment), where the description runs to "a new street (now Canal street) of sixty feet width to be laid out and opened and along the center of a new street (now King street) to be laid out and opened of sixty feet width." The description continues:

"And it is expressly understood by the parties hereto that new streets have been laid down and are to be opened and kept open as public streets and highways as hereinabove specified unless the lines of the same shall be altered with the written assent of the persons who may at the time be owners of lots and premises bounded by such streets." ·

Exhibits 6 to 9, inclusive, each contained this language:

"Also the right of carrying water by suitable aqueducts or races to be cov-·ered or bridged in or along said street (River street); also of banking or raising said street (River street) for the purpose of making an easy ascent and descent over such aqueducts or races." (This description is not carried into the decision nor judgment unless by general reference to the deeds as part of the judgment.)

Exhibit 10 contains no reference to bridges or streets, except it refers to "Lake street or the Black Lake Road" in the description of property conveyed. Exhibit 11 conveys land between Lake street and the basis or pond and refers to Lake street, Morris street (now Main street), and also conveys the land in Lake street opposite the property conveyed; also, the right of "maintaining a sluice along the said Morris street (Main street) and across Lake street sufficient to carry the water that may be drawn as aforesaid upon the last described lot, and also of banking or raising said streets so as to make an easy ascent and descent over the aqueduct and canal across said streets."

In the description in the partition deed, Exhibit No. 12, dated February 2, 1848, whereby the members of the syndicate, so called, divided or partitioned the property then remaining in them, we have a reference to "Main street or Morristown Road," and the description continues:

"The part of the premises laid down on the map as King street being a continuation of the street of the same name laid out on the Mansion House property is hereby declared to be a public street or highway and to be kept open for such purposes. The streets or ways laid down on the map and designated as Mill street and River street are also intended· and declared to be streets or ways for the common use of the parties (and of the public when the public shall assume and maintain the same with the bridges) subject, however, to the rights which are reserved to the parties interested and authorized of carrying or conducting water in, along, and across the same. * * * And will also keep the races or sluices on their premises wherever the same are crossed by streets or ways reserved."

This description does not appear in the decision or judgment, except it may be included in certain of the general obligations imposed upon the parties and to which we have referred. Further reference to streets and bridges is made in this deed Exhibit 12 and are before noted in the judgment.

There are no other references to streets or bridges in the conveyances named. Other deeds were apparently given after the 12 referred to and prior to the commencement of the action in 1870. Among these is one to the village of Ogdensburg, which property passed to and is now owned by the city and is the same as that referred to in the judgment to which attention has been called, of a parcel of land on the easterly side of the river, but only the 12 made a part of the complaint are contained in or referred to in the decision and judgment.

The provisions of the decision are not repeated here as they are contained in the judgment.

I have now gathered from the judgment roll at considerable length not only every allusion to streets and bridges, but also every statement which can be urged as tending to show that the property owners are to build and maintain bridges on the streets in question.

At the hearing of the motion evidence was received of the time when and by whom the streets were laid out on the property, the manner in which and by whom they had been used and worked, and by whom the bridges had been built and maintained from the time of the entry of the judgment for the purpose of showing the practical construction given to the judgment by the parties. The provisions in the judgment under consideration are involved in so much doubt that this evidence was properly received and may be properly considered in determining the right to the relief sought.

It does not appear that the owners of the water power property have ever built or repaired bridges over the canal, conduits, or raceways on Lake, Main, or River streets, the bridges in question on this motion. It appears, however, from the records of the village and its successor, the city, that from at least 1851 the bridges on the streets and the streets themselves have been maintained by the village and the city.

These records clearly establish that these streets and the bridges in question on them have received a great deal of attention from the municipal authorities from as early as 1851 to the time of the making of this motion, and so far as appears there has been no change in the control of the streets and bridges, their management, or the work done on them since the judgment was entered in the action in 1872. From these records it appears that the citizens of the city frequently petitioned the city authorities with reference to the sidewalks and repairs to be made thereon and that the same were repaired and controlled with the bridges thereon, by the city.

The parties to the action evidently accepted the judgment with no thought that it took the burden of maintaining bridges for public use from the public authorities and placed it upon the owners of the water power property. There are references in the judgment roll which undoubtedly require the property owners to build certain bridges on streets, crossing the property for the common benefit of the property owners; but we search in vain for any provisions which even suggest that they are to build bridges for the public.

It is quite evident from the facts we have gathered that the provisions for building bridges and the references to streets were carried

148 N.Y.S.—53

into the decision and judgment by the draughtsman of those papers with no other thought than the interest of the property, its use and development.

The object of the parties to the action, as appears by the judgment roll, was to settle the rights of the owners of the property in the water and to preserve the same for the common benefit. The entire scheme of the action was to provide for the management and development of the property for the common good of those having an interest in it.

It was private property, managed by private citizens who utilized it for private gain and so far as appears without expression of a desire to serve the public or to devote their property for the public good. If the property was to be burdened with a special obligation to maintain bridges for the public use on public streets, it is strange that the eminent counsel connected with the action did not, with apt words and clear phrase, so state. There is not in the judgment a single mention of the public or the building of bridges for the public except where reference is made to parties owning certain lots who are obligated to build bridges "except when the public shall assume and maintain the same."

There is nothing in all the facts gathered from the pleadings, the conveyances, and the judgment from which it can be found that the parties were under any obligation to the public by reason of the conveyances of the property which they took, or by reason of anything which was done by any of them subsequent to their receiving their conveyances, tending to show that they were under obligations or covenants to build bridges for the public. To sustain the contention of the city on this motion it must clearly appear in view of this that these private citizens owning property, carrying certain privileges for their benefit, intended to take upon themselves or place upon each other, covenants, conditions, or burdens, not already existing, by which they obligated their property for the benefit of the public or any one outside of the company of private holders. In the deeds, decision, and judgment we can see that the parties had in mind the management of the water power, its division, and its preservation. No suggestion is made as to the character or kind of bridges that are to be maintained. Undoubtedly the bridges were to be suitable for the purpose of utilizing the property to the best advantage, but this does not mean that bridges shall be built of a size and strength sufficient for public travel.

The needs of the owners for bridges in their utilization of the property might well be, and undoubtedly is, vastly different from that of the public. The owners might well determine that for their purposes bridges were sufficient in number, size, strength, and location, which would not meet at all the needs of the public. The maintenance of a bridge for the use of the property owners might entail but small expenditure, while to maintain the same for public travel would undoubtedly require not only considerable outlay but active attention, for it might well be that, if the obligation to build and maintain exists, liability for failure to do so and for injury from such failure would also

follow.  A holding that such an incumbrance exists against the property, self imposed by the parties, should only be made when it clearly appears that such is the language of the judgment.

For many years, the city, exercising· its power and performing its duty to lay out, maintain, and supervise streets and bridges, has been laying out, building, and maintaining streets and bridges upon this water power property.  It accepted this burden as it was required to do by the judgment in the  action, and its interpretation of that judgment I believe is the correct one.

[4] There is, however, another light in which this motion should be considered and to which we now refer.  The city holds a parcel of the property, and was a defendant in the action by virtue of such ownership, in its private capacity and not as a governmental agency.  In the latter capacity it makes this motion—is it entitled to do so?  A difference is recognized as existing between a private and proprietary instead of a public or governmental right in a municipal corporation.  Dillon, Municipal Cor. pp. 322, 485; French Republic v. Saratoga Vichy Co., 191 U. S. 427–438, 24 Sup. Ct. 145, 48 L. Ed. 247.  If such difference ever exists, its line of demarcation can be seen in the case at hand.  It does not appear just how the city acquired its parcel of property.  Nothing is given to indicate that it has held the property except to utilize it for the ordinary purposes for which real estate is used.  The city was made defendant in the action because of its ownership of a parcel of the property.  The adjudication in the judgment against the city as a defendant is the same as that made against any other defendant.  It acquired no more and no less rights under the judgment than the other defendants in the action.  In its relation to others who are owners each of a parcel of the property, with easements in parcels other than its own, and subject to restrictions in the use of its parcel for the benefit of owners of other parcels of the property, it must be regarded as any private individual who owned a parcel would be regarded.  Its rights and duties with relation to the maintenance of ways and bridges for the common use of owners of the entire property, which ways and bridges might also and incidentally be a convenience to the public, differ materially from its rights and duties as representing the sovereign state to lay out, maintain, alter, and supervise streets and bridges for the public use within its boundaries in which the rights of the owners of the property would be subordinated to the public use.

The city can make this motion only as an individual owner.  It has no standing as a defendant in the action to evoke its power as a governmental agency, and yet it is only because of that power that it claims the right to the relief sought.  It must therefore fail in the motion.

The motion is therefore denied, and an order may be prepared accordingly.